IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| Plaintiff | * |
| v. | *   CIVIL NO. 98-1681(JP) |
| ONE 1956 CONVAIR 440 AIRCRAFT, SERIAL NO. 353, TAIL NO. N912, | * |
| Defendant | * |

**OPINION AND ORDER**

**I.   INTRODUCTION**

The Court has before it Claimant Dodita Air Cargo's Motion for Summary Judgment and Brief in Support thereof (**docket No. 48**) and the United States Opposition thereto (docket No. 54). For the reasons that follow, the Court hereby **DENIES** Dodita's Motion at bar.

**II.  SUMMARY JUDGMENT STANDARD**

Summary judgment serves to "assess the proof in order to see whether there is a genuine need for a trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, a summary judgment is in order when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case the plaintiff,] reveals no genuine issue as to any material fact and the

CIVIL NO. 98-1681(JP)                2

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First National Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Insurance Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1985).

In a summary judgment motion, the movants, in this case Defendants, bear the initial burden of "informing the district court of the basis for their motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the movant does not bear the burden of proof at trial, it must show that no reasonable fact-finder could find that the non-

AO 72A
(Rev.8/82)

CIVIL NO. 98-1681(JP)                3

movant, in this case Plaintiff, has established the requisite elements of its claim. Id. at 325. Once the moving party meets his burden of proof, the burden shifts to the non-movant, who may not "rest upon mere allegations or denials of . . . the pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Goldman, 985 F.2d at 1116; see Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 248.

### III. UNCONTESTED FACTS

1.  Dodita Air Cargo ("Dodita") is a corporation organized and registered under the laws of Puerto Rico and is engaged in the business of the carriage of cargo by air as a common carrier. Dodita is the owner of the 1956 Convair 440 Aircraft, Serial 353, Tail No. N912 ("the Airplane").

2.  On February 19, 1998, Blaine Gardner ("Gardner") and Daniel Edward Todd ("Todd") (collectively, "the Pilots") were working as pilots for Dodita.

3.  On February 20, 1997, Dodita entered into a contract with Holsum Bakers of Puerto Rico for the air carriage of shipments of bread and related products to the Island of St. Croix. The carriage was made on a daily basis and Dodita used the Airplane for these purposes.

4.  On April 27, 1998, a Seizure Warrant was issued by the Honorable Aida Delgado-Colón, United States Magistrate Judge

AO 72A
(Rev.8/82)

CIVIL NO. 98-1681(JP)                4

for the District of Puerto Rico to seize the Airplane as well as a black 1997 Chrysler Jeep Grand Cherokee, license plate number CPL-491 ("the Car"). The warrant states that the its issuance was based on an affidavit filed before Magistrate Delgado-Colón by INS Special Agent José E. Rivera. The Court expressed that the affidavit established probable cause to believe that the property was subject to seizure.

5. On April 29, 1998, Gardner and Todd were indicted by the United States District Court. The charges brought against them were for aiding and abetting Walid Qatoum ("Qatoum") and Jehad Sarrar ("Sarrar") (collectively, "the Aliens"), both of whom were Jordanian nationals and illegal aliens, to illegally enter the United States on February 19, 1998, through the Luis Muñoz Marín International Airport ("LMM") in Carolina, Puerto Rico.

6. On February 19, 1998, the Aliens were detained at the Immigration checkpoint of Terminal A at LMM after failing to have documentation of their immigration status. Both Aliens were stopped by Immigration Inspector Juan Pellot ("Pellot") as they came from outside the security area toward the gate area and tried to board Pan-Am Flight PA072 to New York.

7. During his deposition, Pellot testified that he could not tell whether, before being detained, the Aliens were inside the gate area, went out, and returned to the gate area. Pellot stated,

CIVIL NO. 98-1681(JP)                5

however, that he thought that the Aliens could not have gone out of the gate area without him noticing, as there was only one entrance into the gate area.

8.  Upon being arrested, the Aliens were taken to LMM's INS Office for a secondary inspection. At the INS Office, Inspector Peter Rivera ("Inspector Rivera") interviewed and apprehended Sarrar and Inspector Carmen Gómez ("Inspector Gómez") interviewed and apprehended Qatoum.

9.  Inspector Rivera testified in his deposition that, during the interview, he understood that the Aliens said that they arrived to Puerto Rico from St. Croix, but the translator said St. Thomas. One of the Aliens said that he paid a smuggler $1,500 to be transported from St. Thomas to San Juan.

10. After Inspector Rivera prepared a form known as the I-123, he did nothing with regards to the Aliens until he received a call from the INS District Counsel to testify in the immigration case.

11. The INS District Counsel gave Inspector Rivera copy of the FBI Interview report. Rivera did not know that the FBI had interviewed the aliens.

12. On March 25, 1998, Inspector Rivera met at LMM with INS Special Agent Roberto Guajardo ("Special Agent Guajardo") to discuss the Aliens' case.

CIVIL NO. 98-1681(JP)                          6

13. Inspector Rivera states that LMM was very busy at the time the Aliens were arrested.

14. Believing that the Aliens immigration was a very unusual case that involved national security, Inspector Rivera called the INS Security Headquarters to have it notify the FBI. Inspector Rivera also filed a request for information with Interpol.

15. Inspector Rivera believed that, in order to bypass Customs and the INS pre-flight check point, Gardner used his airport security card to open the terminal doors and lead the aliens into the terminal. Rivera states that there are several doors that lead to the ticket counters, baggage and flight areas.

16. Although some of the doors that led to the pre-flight area did not work due to construction at LMM at the time the Aliens landed in Puerto Rico, Inspector Rivera did not know through which door did the Aliens enter into the terminal.

17. Inspector Rivera stated that the Aliens supplied information during the interviews regarding the secured access doors opened by Gardner, which took them to Terminal A. Rivera, however, did not perform these interviews.

18. Inspector Rivera, however, was present when Guajardo interviewed Sarrar, who stated that he did not give any money to the Pilots and that the Pilots did not talk to him or Qatoum during the trip to Puerto Rico.

CIVIL NO. 98-1681(JP)                7

19. Inspector Rivera stated in his deposition that the investigation of the Aliens was the responsibility of others.

20. Inspector Rivera assumed that the Aliens entered directly to the gate area where they were apprehended because they had gone to the counter area of the terminal to make a telephone call.

21. Inspector Rivera stated in his deposition that based on his experience and belief that the Pilots had been smuggling aliens through the outside doors to the terminal area for some time.

22. Special Agent Guajardo works for the Anti-Smuggling Unit of the INS. Guajardo interviewed the Aliens twice and took two sets of statements. In the process, various drafts of the statements were prepared.

23. Special Agent Pedro Cintron ("Special Agent Cintron") became involved in the investigation as a senior agent. Special Agent Cintron was asked by Supervisory Special Agent Jose Rivera-Miranda to assist Special Agent Guajardo because he was fairly new and needed guidance. Special Agent Cintron assisted Guajardo in the interviews of the Aliens.

24. Sarrar's release from jail was conditioned on giving a sworn statement.

25. According to Special Agent Guajardo, Inspector Riviera received the information from the Aliens identifying the Pilots.

AO 72A
(Rev.8/82)

CIVIL NO. 98-1681(JP)                8

26. Although Special Agent Guajardo did not know through which outside door did the Aliens enter into the terminal, he speculated that it was one of the doors he and Inspector Rivera found that lead straight into the terminal past the checkpoint.

27. Guajardo states that it would have been relevant to retrace the route with the Aliens.

28. The Aliens did not tell Guajardo which particular doors they used.

29. Special Agent Cintrón stated that the Aliens were asked in their interviews if they went through Immigration and Security when they arrived at LMM and responded that they did not.

30. Guajardo came to no real conclusion as to which specific door the Aliens used to enter the terminal.

31. Guajardo testified during his deposition that a former Dodita pilot did not tell him that Dodita was in the "alien-carrying business."

32. Guajardo could not confirm, and did not know, if the money that the aliens allegedly paid the Holsum employee was divided among the pilots and him. Guajardo states that the INS had prior statements that said that they money was split with the pilots, but admitted that the Aliens gave statements in which they said that they did not know to whom the smuggling money went.

CIVIL NO. 98-1681(JP)                    9

Guajardo further admitted that the INS could not prove that the pilots received any money.

33. A report dated April 1, 1998 from Guajardo states that the pilots split the money obtained in smuggling the aliens and that he received this information from Inspector Rivera. The report adds that the Pilots diverted the Customs Officer while the red service truck took the aliens out of the ramp.

34. Guajardo did not specifically ask the Aliens whether the Pilots knew that they were aliens or whether they had gone to the airline personnel when they entered the terminal.

35. According to Guajardo, the fact that the pilots did not declare the Aliens with Customs indicated that they meant to shield or hide the Aliens.

36. Guajardo recalled discussing with Special Agent José Elías Rivera-Miranda, his supervisor, whether the Airplane should or should not be seized.

37. INS agents who assist in or contribute to the seizure of an aircraft may receive departmental recognitions.

38. Rivera-Miranda prepared and subscribed the affidavit that served as the basis for the issuance of the order to seize the Airplane. In preparing the affidavit, Rivera-Miranda relied on the statements from the Aliens, the Customs Declaration Form from St. Croix, and the Customs Declaration from LMM.

AO 72A
(Rev.8/82)

CIVIL NO. 98-1681(JP)                    10

39. Rivera-Miranda felt he had enough information for a warrant. The Aliens identified the Airplane and the Pilots, and the documents proved the dates and their departure from St. Croix to San Juan.

40. Rivera-Miranda had no information to indicate that the owner of the Aircraft had knowledge of the activity. The INS did not interview the owners before the seizure.

41. On April 30, 1998, the Airplane was seized as well as the Car. The Car, however, turned out to be the wrong automobile. The vehicle actually used by the Pilots was a Ford Aerostar van.

42. Supervisory Agent Rivera-Miranda stated that, at one time, there was money exchanged between the Aliens and the Pilots. Rivera-Miranda's admitted that his affidavit stating that the Aliens paid $1,000 to the Holsum employee was based on the statements of the Aliens.

43. Although Rivera-Miranda stated in his affidavit that "[An] individual claimed that he had contacts with smugglers who were willing to smuggle them from St. Croix to Puerto Rico for a fee of one thousand dollars each," he admitted that the statements of the Aliens did not contain such an averment.

44. Although Rivera-Miranda averred in the affidavit that the Aliens were instructed by the Holsum employee to stay hidden

CIVIL NO. 98-1681(JP)          11

inside the truck, he admitted that the statements of the Aliens did not contain such an averment.

45. Although Rivera-Miranda averred in the affidavit that the pilots continued to shield the Aliens from detection upon landing at LMM, he admitted that the statements of the Aliens did contain such an averment.

46. Rivera-Miranda stated that, in drafting the affidavit, he relied on the statements given to him by the agents.

47. Rivera-Miranda admitted that he did not know through which door did the Aliens and Gardner entered.

48. During the criminal trial of Miguel Cruz, Qatoum testified that Gardner, opened the doors of the terminal with a card, and took him and Sarrar to the Pan-Am office, and were left there. This was a way to bypass the immigration checkpoint and board the plane to New York. The Aliens gave their tickets and passports to a woman at the airline counter, who told them to show them to the Immigration officers at the General Immigration area in the Airport. This area is not the Immigration area one goes before boarding an international flight.

**IV   DISCUSSION**

The instant case is a civil *in rem* forfeiture proceeding under 8 U.S.C. §1324(b) against Dodita's airplane. Dodita's argues that the civil forfeiture of the Airplane would only proceed for a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and that,

CIVIL NO. 98-1681(JP)                    12

because Plaintiff did not specify in its Complaint the specific subsection of § 1324(a)(1)(A) under which it is pursuing this action, the instant case should be dismissed. In the alternative, Claimant sustains that it is uncontested that Plaintiff lacked probable cause to establish a violation under section 1324(a)(1)(A)(ii) as required by section 1324(b)(5). Instead, Claimant argues that, at the time the Airplane was seized, Plaintiff did not have "an iota of evidence to at least have more than mere suspicion" that Claimant or the pilots were aware of the Aliens' illegal immigration status. Therefore, Plaintiff cannot sustain the instant forfeiture action.

Claimant's first argument for dismissal is of a procedural nature. In particular, Claimant argues that Plaintiff has pursued a "wait and see" approach to the instant forfeiture action by not specifying under which subsection of 1324(a)(1)(A) its claim is grounded. Plaintiff counters with two propositions. First, that their Complaint is specific in articulating their reasons for forfeiture because an affidavit which was made to form a part of it states that the acts of the Pilots violated sections 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(iii). Therefore, the lack of specificity argument put forth by Claimants is groundless. Further, Plaintiff states that Claimant is mistaken in stating that it can only seek forfeiture under the subsection for which the criminal case against Gardner was filed, section 1324(a)(1)(A)(ii).

CIVIL NO. 98-1681(JP)                    13

The Court finds that Plaintiff's Complaint does not lack specificity. Plaintiff has included an affidavit which was incorporated to the Complaint stating the particular subsections under which the criminal complaint was brought. This statement should put Claimant on notice as to the relief sought by Plaintiff. Therefore, Claimant cannot sustain that under Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff has failed to meet the specificity standards of pleading.

Plaintiff has also stated in its ISC Memorandum (docket No. 9) that the affidavit attached to the Complaint provides the basis of the forfeiture action. The Court agrees. The Initial Scheduling Conference serves as a mechanism through which the parties and the Court can delineate the issues and the claims being brought with specificity. Therefore, the Court is not compelled by Claimant's arguments regarding vagueness during the pleadings. The parties have been engaged in discovery for several months and by this time are familiarized with each other's arguments.

The Court, however, will circumscribe Plaintiff's forfeiture case to the alleged violations of section 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(iii). These are the subsections mentioned in the affidavit attached to the Complaint. The Court in its ISC Call requires the parties to be specific in their claims and it would be inherently inequitable to expect Claimant to defend fronts which are

CIVIL NO. 98-1681(JP)                    14

unclear. The Court proceeds to address the substantive arguments of the motion sub judice.

For a forfeiture of a conveyance to take place under section 1324(b)(1), the government must establish that the conveyance was used in the transportation of illegal aliens in violation of 8 USC § 1324(a). See U.S. v. 1982 Ford Pick-Up VIN 1FTDX15G7CKA31957, 873 F.2d 947, 950 (6th Cir. 1989). In relevant part, Section 1324(b) states that,

> any conveyance, including any . . . aircraft, which has been . . . used in the commission of a violation of [section 1324 (a)] shall be seized and subject to forfeiture, except that (A) no conveyance used by a person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to the illegal act; and (B) no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States or of any State.

Subsections 1324(a)(1)(A)(ii) and (iii) imposes criminal liability on any person who,

> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United

CIVIL NO. 98-1681(JP)                    15

States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

In sum and as it applies to the instant case, in order for the government to prosper in this action, the Airplane must have been used in furtherance of the violations set forth in subsections 1324(a)(1)(A)(ii) or (iii) and the owner or other person in charge of the conveyance must have been a consenting party or privy to the illegal act.

In the instant case, civil forfeiture requires that the government show probable cause that the seized conveyance was used in the commission of a violation of section 1324(a)(1)(A)(ii) or (iii). See United States v. One 1985 Ford F-250 Pick-Up, VIN 1FHTX 2518FKB 39351, 702 F.Supp. 1304, 1306-07 (E.D. Mich. 1988). If the government establishes probable cause for the institution of the forfeiture, the claimant must rebut the prima facie case. Probable cause, however, requires a reasonable ground for belief of guilt and, therefore, constitutes a "relatively light burden." United States v. Parcels of Property at 225 Broadway, 9 F.3d 1000, 1004 (1st Cir. 1993).

Claimant Dodita moves for summary judgment stating that the uncontested facts prove that the government does not even an iota of evidence to establish probable cause that the conveyance was used in

AO 72A
(Rev.8/82)

CIVIL NO. 98-1681(JP)                16

violation of sections 1324(a)(1)(A)(ii) or (iii). The Court disagrees. There is evidence on the record for the proposition that the Pilots could have known or recklessly disregarded that they were transporting illegal aliens in the Airplane.

First, the Pilots failed to declare that they were carrying passengers in the Airplane upon arriving in Puerto Rico. This could be interpreted as an intent to conceal the passengers. Second, of the Aliens stated that he paid a smuggler $1,500 to be transported to the Island.

Claimants also state that it is uncontested that the evidence used to seize the Airplane was misleading and questionable, thereby making the lack of probable cause an uncontested conclusion. The Court is not persuaded by Claimants arguments. Although Claimants focus on the proposition that the evidence shows that Inspector Peter Rivera performed a sub-par investigation, Claimants cannot ignore that it is uncontested that there were others involved in the investigation, such as INS Agent Roberto Guajardo.

Further, the Court is not persuaded by Dodita's arguments that summary judgment should be entered because of the fact that Guajardo was inexperienced or coerced the Pilots. These issues would be best addressed during the probable cause hearing as they involved issues of degree which are contested.

CIVIL NO. 98-1681(JP)                    17

Furthermore, the fact that Guajardo received information from Rivera regarding the way in which the Aliens entered the airport does not necessarily establish that probable cause hearing is lacking. For instance, it is uncontested that the Aliens provided the information during their interviews stating that Gardner had used his security cards to allow them to enter the airport. It is further uncontested that the Aliens identified the Airplane as the conveyance used to bring them to Puerto Rico.

With regards to the doors through which the Aliens entered LMM, the Court finds that the fact the INS inspectors did not know which specific door the Aliens used does not negate the fact that there is evidence on the record for the proposition that the Pilots brought the Aliens through one of the doors of the Terminal.

Finally, Dodita claims that it is uncontested that the Aliens did not have the Pan-Am boarding passes upon arriving in Puerto Rico, and, therefore, could only receive them at the airline counter. This means that the Aliens must have exited LMM's gate area. The Court, however, notes that the statement made by the travel agent and included by Dodita says that the travel agency issued the boarding pass. This contradicts Dodita's position.

CIVIL NO. 98-1681(JP)          18

In view of the uncontested facts before the Court, there is sufficient evidence to establish probable cause that the Airplane was used to transport the Aliens. Therefore, the Court hereby **DENIES** Dodita's Summary Judgment Motion.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of November, 1999.

JAIME PIERAS, JR.
U.S. DISTRICT JUDGE